13 So.2d 437

### SIMPSON v. STATE.

**3 Div. 849.**

Court of Appeals of Alabama.
March 23, 1943.

Rehearing Denied May 11, 1943.

C. L. Hybart, of Monroeville, and Frank G. Horne, of Atmore, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and L. S. Moore, Asst. Atty. Gen., for the State.

**SIMPSON, Judge.**

The defendant was indicted, tried and convicted of murder in the second degree for the killing of Frank Wadkins.

The question of moment for our decision is whether or not a new trial should be ordered (the trial court having denied the motion for same) on the alleged ground that the verdict was contrary to the great weight of the evidence. McDowell v. State, 238 Ala. 482, 191 So. 894. Or, otherwise posed, Was the evidence so preponderantly against it that to allow the verdict to stand would be wrong and unjust? Roan v. State, 225 Ala. 428, 143 So. 454; Taylor v. State, 30 Ala.App. 316, 5 So.2d 117.

The transaction giving rise to the prosecution occurred about 12:30 or 1 o'clock on the night (Sunday morning) of July 29, 1939, in an uninhabited section of Flomaton, Alabama, on a narrow road, in a swampy, wooded section, and where there were no street lights.

The defendant was keeping company with a woman between 33 and 34 years of age, by name of Mrs. Louise Barnes, who was a sister of Frank Wadkins (the deceased) and a daughter of Mr. Early Wadkins, the only eye witness to the fatal affray other than defendant. Her said father, Early Wadkins, was opposed to this association, had so told defendant, and had warned him "to stay away."

The evidence is pretty clear that Early Wadkins had been drinking considerably the afternoon before and the night of the tragedy, and that his son, Frank, had also probably had a drink. It is also uncontroverted that Early Wadkins was looking for a gun that night, and tried to borrow one from Orvis White, a service station operator, and that, when Mrs. Barnes heard about it, she communicated this to defendant, and told him "not to come out to her house that Dad and them were after him; that she thought they had a gun; that she told Mr. Simpson she wasn't going back home and that she would meet him at Mr. Kornegia's drive way; that Mr. Kornegia's drive was south of her house—she supposed an eighth of a mile or something like that."

It appears the couple kept the planned rendezvous—as suggested by Mrs. Barnes—but, upon returning to a place near her home, where she alighted from defendant's car, the two Wadkinses immediately got in their car and gave chase to the defendant, who, in order to elude them, turned his car from the highway on to this side road which led back toward Flomaton, his purpose being to return to town for "protection." His attempted flight, however, was futile, for the Wadkins men overtook him, crowded him to the road side, brushed or struck his fender with their car as they passed, pulled on by, and stopped in front of him. At this juncture, they both, or Frank (here seems to be one of the few conflicts in the testimony of the two eye witnesses) got out of their car, and, as Frank (or they) started or was (were) in the act of starting toward defendant who was still in his car and in a seemingly inextricable situation, the defendant (who testified he kept his pistol in the car) fired one shot, killing Frank Wadkins. When Early Wadkins turned his attention to his stricken son, the defendant drove on past them (he could not back up), returned to Flomaton, ordered an ambulance for Frank, and reported to an officer of the law.

From a relation of the above, it is clear that the defendant was not the aggressor in the difficulty; and that there was apparently open to him any reasonable mode or way of escape or retreat, after having been chased down as he was, is left in grave doubt by the evidence.

Mr. Wadkins tried to justify this pursuit of defendant when he testified "that they were going to see if they could find Louise Barnes and bring her back home to behave herself." But, aside from his daughter being well past maturity and living away from his home and in her own apartment, this very claim or pretext is shown to have been wholly unfounded by his own statement, on his cross examination, when he admitted (record, p. 21) that—though the lights of defendant's car blinded him so he could not see who fired the shot—he knew it was the defendant who shot his son because there was no one in the car but the defendant; that he knew this because they had

been following defendant for some considerable distance (with head and fog lights) and could see then and as they passed him that he was alone.

So, sifting the evidence, briefly and substantially, it clearly preponderates the conclusion that the defendant fled from the two Wadkinses, who, without legal cause, chased him into the swampy, uninhabited place and there intercepted his flight and prevented his further escape by driving ahead of him and stopping. Then, at this time and place, where, to say the least, further escape or retreat was improbable, if not in fact impossible, the defendant fired the fatal shot as the deceased made the first demonstration (or overt act) in getting from his automobile and starting toward defendant. And all this after defendant had been warned that the Wadkinses "had a gun" and were "after him.'" In view of this practically undisputed evidence, we are unwilling to affirm the conviction. The case, we think, deserves to be tried before another jury.

We are mindful of our responsibility in so concluding, and that the lower court's findings in such cases are presumptively correct. Nevertheless, we have a duty to perform, and, as illustrated in the quotation by Judge Rice, in the case of Taylor v. State, 30 Ala.App. 316, 5 So.2d 117, 118: "This court has not renounced its duty nor neglected its power * * * to revise the verdicts of juries and the conclusions of trial judges on questions of fact, where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach a clear conclusion that the finding and judgment are wrong."

The charge for which the defendant stands convicted—murder in the second degree—is that he did unlawfully and maliciously kill Frank Wadkins.

But, if the defendant was not the aggressor—was free from fault—in the fatal affray (as is indicated above), and if there was no reasonable means of further escape or retreat available to him and, as a reasonable man, he was in actual or apparent peril of life or limb, then the killing cannot be said to have been legally inexcusable.

And as for attending malice, no such toward deceased is shown except that which is legally inferable from the use of the deadly weapon. Even here, though, the law asserts that this presumption does not attain where "the circumstances of the killing disprove malice." Dixon v. State, 128 Ala. 54, 57, 29 So. 623, 624. Or, otherwise stated, where "the evidence which proves the killing rebuts the presumption." Hornsby v. State, 94 Ala. 55, 66, 10 So. 522, 526; McDowell v. State, supra; 11 Alabama Digest, Homicide, ☞ 146. And if there is an absence of malice, though the killing be not justified, it is not murder. See Smith v. State, ante, p. 12, 11 So.2d 466, for a pertinent discussion of the principle.

Each judge has read and studiously considered the entire evidence. Viewing the same as hereinabove indicated and after due consideration of the whole case, we feel duty bound to hold that the defendant is entitled to another trial. The learned trial judge denied the defendant's motion for same, which we think was erroneous, and for this cause is reversed and remanded.

Reversed and remanded.